UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Travis Carr,                                                                Case No. 3:18-cv-2206

                Plaintiff,

      v.                                                             MEMORANDUM OPINION
                                         AND ORDER

FCA US, LLC,

                Defendant.

## I.     INTRODUCTION

On September 25, 2018, Plaintiff Travis Carr filed a complaint against Defendant FCA US, LLC alleging FMLA retaliation, and wrongful or retaliatory termination and disability discrimination under Ohio law. (Doc. No. 1). Currently pending is FCA's Motion for Summary Judgment. (Doc. No. 36). Carr opposed the motion, (Doc. No. 38), and FCA filed a reply. (Doc. No. 40).

## II.     BACKGROUND

FCA is a vehicle manufacturer whose production line workers are represented by the United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW" or "Union"). Carr was hired as full-time production worker at the Toledo plant on May 1, 2013, and immediately became a member of UAW Local 12 subject to a collective bargaining agreement between the Union and FCA. (Doc. No. 25 at 6). Carr was elected union steward in May 2014. (Id. at 9). Carr remained employed at the Toledo plant until his termination on September 28, 2016. (Doc. No. 25-19).

Over the course of his tenure as steward, Carr earned a reputation as a vocal advocate for his constituents and the UAW.  (*See* Doc. No. 30 at 10; Doc. No. 33 at 14; Doc. No. 35 at 16).  Carr asserts he raised multiple discrimination complaints for his constituents, but he only offers specific evidence as to one such incident.  (*See* Doc. No. 38 at 8-9).

On or about March 11, 2015, and continuing through that month, Carr raised complaints of disability discrimination and hostile work environment on behalf of his constituents against Jackie O'Neal.  (Doc. Nos. 38-4 through 38-6).  Specifically, Carr stated O'Neal shouted at her operators in a manner that was "coercive, threatening, hostile and discriminatory," (Doc. No. 38-4; Doc. No. 25-8); and she mocked an employee who had an ankle injury.  (Doc. No. 38-6).  Carr also passed along allegations of hostile work environment against Calandra Reasonover-Payne related to numerous communication and work-related issues.  (Doc. No. 38-5).  Carr also recalled an incident in July 2015 when he submitted statements on behalf of Union members regarding the racially discriminatory conduct of Dave Scruggs.  (Doc. No. 25 at 62).  Carr had no documentation concerning this incident.

By Carr's own admission, his vocal advocacy involved disagreements with both management and other UAW officials.  (*See* Doc. No. 25 at 12-13, 30, 59-60).  In advocating for his constituents, Carr believed the use of vulgar language and raising his voice were appropriate tools.  (*Id.* at 22).  Gerald Perez, Labor Relations Supervisor for FCA,[1] testified he believed Carr had trouble controlling his temper; this belief was formed from multiple complaints about Carr's behavior and his discussions with Carr where Carr admitted "he might have got a little out of control."  (Doc. No. 32 at 18).  Larry Price, a Labor Relations Representative, echoed these sentiments testifying, "[Carr] was a good guy, but very argumentative.  Everything was an argument.  Even just minor little things

---

[1]  At the time Carr was elected steward in 2014, Perez was Labor Relations Supervisor at the Toledo plant.  By the time of Carr's termination in 2016, Perez had relocated to the Sterling Heights plant and was not involved in the decision to terminate Carr's employment.  (Doc. No. 32 at 11, 26).

would just spill into an argument. He was often upset and angry." (Doc. No. 33 at 14). On at least two occasions, Carr had a meeting with FCA management and other Union officials to discuss his demeanor. (Doc. No. 25 at 21).

### May 24, 2016 Incident & Disciplinary Investigation

On May 25, 2016, Maxine Isaac reported to HR that during the Union committee election count[2] the previous evening, Carr had "demonstrated threatening behavior towards her and created a hostile work environment." (Doc. No. 33-15 at 1). That same day, Labor Relations Supervisor Connie Rubin began an investigation into the events by putting Carr on notice of the disciplinary investigation. (*Id.* at 4). Rubin interviewed Isaac, Carr, and seven witnesses, as well as reviewing Carr's written statement and his contemporaneous Facebook posts. (*See* Doc. No. 33-15).

According to all the witnesses, Isaac began the count by explaining that no phones were permitted and requested everyone present turn off their cell phones. (*Id.*). Although Isaac specifically asked Carr to turn off his phone multiple times, he did not comply. (*Id.* at 4). Isaac then told Carr to "[t]urn the fucking phone off," after which he "leaned into the aisle and threw his phone at Isaac in a 'violent manner.'" (*Id.*). Isaac stated the phone barely missed her, hit the wall "very hard", and that at the time he threw the phone, Carr was only a few feet from her. (*Id.*). She reported feeling "threatened" and "very uncomfortable because it had become a hostile environment," and that Carr "threw the phone with no regard for others." (*Id.* at 5). Following this, Isaac asked security guard Angelique Bedee to remove Carr from the count. (*Id.*).

Bedee's written report of the incident stated that about 15 minutes into the count she heard an "unexpected loud noise," like something hit a door. (*Id.* at 7). Shortly thereafter, Isaac requested Bedee make Carr leave the room. Upon entering, Bedee picked up a cell phone and in response to

---

[2] Isaac was the Chairperson for the committee election and was responsible for counting the votes cast. (Doc. No. 31 at 7; Doc. No. 25 at 38). Carr was present as a challenger – a union member selected to observe the count and challenge any irregularities in the process. (Doc. No. 25 at 39).

her question, Carr admitted he had thrown it.  (*Id.*).  Bedee characterized Carr's demeanor as "very upset."  (*Id.*).  Attempts to calm Carr down were unsuccessful, and Carr stormed out stating "I'll just leave."  (*Id.*).  Following Carr's departure and the conclusion of the count, Bedee confirmed with the other occupants of the room that Carr had thrown his phone.  (*Id.*).

The other witnesses generally confirmed this description of events.  (*Id.* at 5-7).  The witnesses affirmed that Carr repeatedly refused to comply with Isaac's directive to turn off his phone.  (*Id.*).  Regarding throwing the phone, the witnesses variously stated: Carr did a "bowling throw" of his phone in "her general direction," (*id.* at 5), he "threw his phone in her direction," (*id.* at 6), "a blue phone went whizzing by towards Maxine and hit the door," (*id.*), and he "flung his phone . . . in the direction of Maxine."  (*Id.* at 7).  The witnesses described Carr's behavior as immature, emotional, upset, argumentative, unprofessional, disrespectful, disruptive, and childish.  (*Id.* at 5-7).  None of the witnesses reported feeling intimidated by Carr but stressed that Isaac had the situation under control and others were ready to act if the situation further escalated.  (*Id.*).

When interviewed on May 26, 2016, by Rubin, Carr's version of the events matched those of his co-workers.  He stated he was "very frustrated" and "angry" because everyone was telling him to shut off his phone, so he threw his phone towards the front of the room.  (*Id.* at 8).  Carr claimed the phone was never air borne and he described it as "bowl[ing] it away from [me]."  (*Id.*).  Yet, in a contemporaneous Facebook post, Carr wrote "I threw it because she continued to yell at me while I was trying to power it down but whatever it is what it is."  (*Id.* at 14).  In his interview, Carr complained of stress due to his position as union steward.  (*Id.* at 9).

Following the investigation, Rubin concluded Carr had thrown his phone in Isaac's direction and that Isaac believed Carr's actions to be hostile and threatening.  (Doc. No. 35 at 26).  She then

determined Carr's actions violated FCA's Standards of Conduct Nos. 8, 14, and 15.[3]  (*Id.* at 28; Doc.

No. 33-15).  In her report dated May 26, 2016, Rubin recommended Carr be discharged.  (Doc. No.

33-15 at 2).  On May 27, 2016, Toledo Plant HR Manager Ed Schaffer and Toledo Plant Manager

Chuck Padden approved Rubin's recommendation to terminate Carr.  (Doc. No. 33-15 at 2).

Normally, disciplinary decisions are made locally by plant HR and management. (Doc. No. 35 at 12).

But in this instance, because Rubin recommended termination, it also required the approval of

FCA's corporate Labor Relations department - the approval of either Jo'Lena Brown (Labor

Relations Manager) or Roy Richie (Director of Employee Relations).  (*Id.* at 18; Doc. No. 26 at 7-8).

Rubin testified she emailed her disciplinary report and recommendation to Brown on May

26, 2016.  (Doc. No. 35 at 28).  Brown was uncertain of the date when she received Rubin's report,

but stated she reviewed it and passed it along to her boss, Richie, for a final determination since it

involved a Union official.  (Doc. No. 26 at 7-8).  Richie testified he reviewed the disciplinary report

and recommendation prior to June 2, 2016, when Carr took a leave of absence, but did not recall the

exact date.  (Doc. No. 34 at 12-13).  Richie testified it would be rare, and against general practice, for

FCA to terminate an employee while out on leave of absence, but there are situations when the

conduct warrants immediate termination.  (*Id.* at 12).

In any event, no further action was taken on the disciplinary recommendation between May

27, 2016, when the termination was approved locally, and June 2, 2016, when Carr applied for a

leave of absence.  (*See* Doc. No. 34 at 18).

**Leave of Absence**

---

[3]  Standard of Conduct No. 8 prohibits "[h]arassment of any kind in the workplace . . . ."  (Doc. No.
25-3).  Standard of Conduct No. 14 prohibits "[t]hreatening, intimidating, coercing, harassing,
retaliating, or abusive words and/or actions, conveyed physically, orally, in writing or otherwise, that
would cause reasonable people to take actions against their will, feel unsafe, uncomfortable, or in
fear of danger or violence, including directing aggressive use of obscene or profane language or
gestures toward or in the presence of another."  (*Id.*).  Standard of Conduct No. 15 prohibits
"[f]ighting, 'horseplay' or other disorderly, disruptive or unruly conduct."  (*Id.*).

To summarize the timeline of relevant events: The incident involving Isaac occurred on May 24, 2016, and FCA began its investigation on May 25, 2016.  Carr was interviewed about the May 24 incident on May 26, 2016.  Carr was scheduled to work on May 27 and 28, 2016, but he did not report to work; the reason for this absence (or whether it was excused) is not apparent from the record.  (Doc. No. 25 at 46).  On or about June 2, 2016,[4] Carr requested a leave of absence under the Sickness and Accident program.  (*See id.* at 46; Doc. No. 25-11).

The Sickness and Accident program ("SA Leave") is a contractual benefit for Union members distinct from FMLA leave.  (Doc. No. 25 at 47).  SA Leave provides up to 52 weeks of paid leave to eligible employees prior to them having to utilize unpaid FMLA leave.  (*Id.*).  An employee can apply for SA Leave by simply contacting the FCA Service Center to report their claim.  (*See* Doc. No. 25-11).  After applying, an employee's physician must provide substantiating documentation to certify the disability claim.  (*Id.*).

The FCA Service Center is run by Sedgwick, an independent third-party administrator that manages employee leave for FCA.  It is standard procedure for employees requesting leave to only notify Sedgwick, and not FCA directly, of their leave requests and the reasons for those requests.  (Doc. No. 25 at 46-47).  Similarly, all supporting medical documentation is provided only to Sedgwick.  (*Id.* at 47).

On June 3, 2016, Sedgwick sent Carr a letter confirming his application for disability benefits under SA Leave, assigning him SA Leave claim #30165942021, and requesting supporting medical documentation.  (Doc. No. 25-11).  It appears from the record that Henry Naddaf, M.D., diagnosed Carr with stress, anxiety, and depression and took him off work from June 1 – June 30, 2016.[5]

---

[4]  There is no information in the record, that accounts for the intervening dates and whether Carr was scheduled to work any days in that period, or Carr's status on those dates.

[5]  The record is not clear, and the parties do not provide much guidance, as to the dates when Carr provided certain medical documentation to Sedgwick; nor are Sedgwick's communications clear as

(Doc. No. 38-27).  Carr alleges Sedgwick approved his SA Leave for this period due to stress, anxiety, and depression, and FCA does not appear to dispute this.[6]  Rubin stated a co-worker, Keith Carr, informed her, on an unspecified date, that Carr had taken a leave of absence though not why he took leave.  (Doc. No. 35 at 31).

Sedgwick sent Carr another letter on July 28, 2016, listing the same SA Leave claim number, extending his benefits through July 31, 2016.  (Doc. No. 25-12).  This extension was supposedly for a left-hand laceration but there is no medical documentation in the record supporting this extension. (*See* Doc. No. 35 at 33; Doc. No. 35-11).  Rubin learned of the reasons for Carr's leave of absence no later than July 27, 2016, including both the hand laceration and the mental health conditions.  (*See* Doc. No. 35 at 31, 33; Doc. No. 35-11).

On July 29, 2016, psychiatrist Tanvir Singh, M.D., extended Carr's disability through August 31, 2016, due to his mental health conditions.  (Doc. No. 38-28).  On August 26, 2016, Sedgwick sent Carr a letter, again citing the same SA Leave claim number, confirming the extension of his SA Leave through August 31, 2016.  (Doc. No. 25-13).

On August 29, 2016, Sedgwick ordered Carr to complete an IME with psychiatrist Robert Schmidt, M.D., regarding his mental health conditions.  (Doc. No. 25-14).  Dr. Schmidt noted Carr's symptoms – stress and anxiety – were tied specifically to his position as union steward.  (Doc. No. 38-29 at 1-2).  Carr reported he could resume his production line work but the "job as a union

---

to when it received information or the exact dates of the SA Leave or accompanying extensions. For example, Dr. Naddaf's report simultaneously represents three dates on the face of the document, July 7, July 15, and July 18, 2016; thus, it is impossible to tell when Sedgwick received the information.  (Doc. No. 38-27).

[6]  While neither side has presented documentation from Sedgwick supporting this characterization at the time Carr's SA Leave was initially granted, FCA does not dispute that "Sedgwick initially certified Carr's paid leave of absence under the S&A program for stress/anxiety/depression and subsequently approved two extensions of the leave, first for a hand laceration and then for a surgical procedure.  Carr's paid leave of absence lasted from June 1, 2016 through September 11, 2016." (Doc. No. 36-1 at 7).

steward was just more than what he could handle. . .." (*Id.*).  Dr. Schmidt diagnosed Carr with

Bipolar disorder and recommended further psychiatric treatment but otherwise cleared Carr to

return to work as a production worker.  (*Id.* at 3-4).  On September 2, 2016, Sedgwick informed Carr

that he could return to work without restrictions for his mental health conditions.  (Doc. No. 25-15).

But in the interim, Carr also provided medical documentation to Sedgwick that extended his

SA Leave until September 11, 2016, to accommodate a surgery.  (Doc. No. 25 at 49; Doc. No. 25-

16).  Again, this extension was listed under the same SA Leave claim number.  (*See* Doc. No. 25-16).

On September 6, 2016, Sedgwick emailed Rubin regarding Carr; the following is the contents

of the communication:

> Mr. Carr's SA claim was approved for both a physical and mental health condition.
> Mr. Carr had a DEP (IME) on Friday Sept 2 and was found able to return to work
> with no restrictions as a result of the MH condition.  The medical cert for the
> physical condition expired 8/31/16.  Sedgwick will call Mr. Carr today and tell him
> to report to plant medical for reinstatement.  However, Mr. Carr asked Sedgwick to
> fax disability forms to ANOTHER doctor, different specialty.  We have not received
> any medical from that doctor yet, just letting you know there may be additional
> diagnoses requested in this claim.

(Doc. No. 38-10) (emphasis in original).

On September 7, 2016, Sedgwick sent a communication to Carr confirming he had requested

intermittent FMLA leave (rather than SA leave) on September 6, 2016 but withholding a

determination on his eligibility.  (Doc. No. 25-17).  This correspondence assigned a new claim

number (#301664674360001IFN) to Carr's FMLA request.

On September 23, 2016, Dr. Singh completed Carr's FMLA certification documents

requesting Carr be permitted to take intermittent leave 1-2x/week for up to 2 days per episode due

to his mental health conditions.  (Doc. No. 38-30).  On October 18, 2016, Sedgwick approved Carr's

request to use intermittent FMLA leave from September 23 – December 31, 2016.  (Doc. No. 38-

13).  This correspondence listed the same claim number as in the September 7, 2016

communication.  (*Id.*).

**Carr's Return to Work**

Carr returned to work on September 12, 2016. (Doc. No. 25 at 49). Upon his return, Carr's term as union steward had expired and he was without a bid position, so he was assigned various jobs in different areas. (*Id.* at 52).

While the dates are unclear, sometime after September 6, 2016, when Rubin learned Carr was cleared to return to work, she reached out again to Brown regarding Carr's discipline. (Doc. No. 35 at 32; *see also* Doc. Nos. 28 & 33-18). Brown emailed Rubin on September 27, 2016, informing her that she could proceed with Carr's termination. (Doc. No. 29 at 3). Brown testified she was merely the messenger of Carr's termination, and the final decision to terminate was made by Richie. (Doc. No. 26 at 10). Richie confirmed he did not challenge the recommendation that Carr be terminated. (Doc. No. 34 at 15).

Price informed Carr of his termination on September 28, 2016, for violating FCA's Standards of Conduct 14 and 15 on May 24, 2016. (Doc. No. 25-19). Price reported no adversarial reaction from Carr when he learned of his termination. (Doc. No. 33 at 31). There were no reports regarding Carr's behavior between September 12 – 28, 2016. (Doc. No. 35 at 32).

Carr filed a grievance regarding his discharge on October 3, 2016, and as of the briefing, the grievance was still pending and unresolved. (Doc. No. 38 at 8; Doc. No. 38-13).

## III.   STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the [record] . . . ,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more

9

essential elements of the non-movant's claim.  *Id.* at 323-25.  Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. Gen. Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party."  *Williams v. Belknap*, 154 F.Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  But "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. United States*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact."  *Williams*, 154 F.Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried."  *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F.Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, I must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

## IV.    ANALYSIS

### A. FMLA RETALIATION

The FMLA prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any individual" for exercising their rights under the FMLA. 29 U.S.C. § 2615(a)(2). To establish a prima facie case of FMLA retaliation, Carr must show: (1) he was engaged in an activity protected by the FMLA; (2) FCA knew that he was exercising his rights under the FMLA; (3) after learning of Carr's exercise of FMLA rights, FCA took an employment action adverse to him; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012).

FCA argues Carr cannot establish the second, third, and fourth elements of his prima facie case. (Doc. No. 36-1 at 9-10). The record shows Carr did not engage in protected activity until September 6, 2016, when he requested intermittent FMLA leave from Sedgwick. (Doc. No. 25-17). Important to establishing the second element is when FCA became aware of Carr's request. Carr asserts FCA became aware of his FMLA request on September 6, 2016, when Sedgwick emailed Rubin about Carr. (Doc. No. 38 at 23; Doc. No. 38-10). The following is the contents of this communication:

> Mr. Carr's SA claim was approved for both a physical and mental health condition. Mr. Carr had a DEP (IME) on Friday Sept 2 and was found able to return to work with no restrictions as a result of the MH condition. The medical cert for the physical condition expired 8/31/16. Sedgwick will call Mr. Carr today and tell him to report to plant medical for reinstatement. However, Mr. Carr asked Sedgwick to fax disability forms to ANOTHER doctor, different specialty. We have not received any medical from that doctor yet, just letting you know there may be additional diagnoses requested in this claim.

(Doc. No. 38-10) (emphasis in original).

11

The email does not mention an FMLA request.  Instead, it addressed Carr's SA Leave for both physical and mental conditions and noted that Carr had been approved to return to work. While the email does state Carr requested additional disability forms be sent, Sedgwick did not provide any further information to Rubin regarding this request at that time.

This communication is insufficient to create a genuine dispute of fact as to whether FCA knew of Carr's FMLA request.  The email does not mention an application for FMLA leave.  And while an employee is not required to explicitly request leave under the FMLA, he must provide sufficient notice to the employer that he was suffering from an FMLA-qualifying condition to satisfy this element.  *See Gipson v. Vought Aircraft Indus., Inc.*, 387 F. App'x 548, 557 (6th Cir. 2010); *see also Cox v. Hausman*, No. 3:17-CV-02420, 2020 WL 5814476, at \*9 (N.D. Ohio Sept. 30, 2020) (holding employee's notice to employer of father's "serious illness" was not sufficient to trigger FMLA).

Arguably, FCA was aware of Carr's potential FMLA-qualifying conditions, specifically his mental health conditions, by virtue of his approved SA Leave.  *But see Brock v. United Grinding Tech., Inc.*, 257 F.Supp.2d 1089, 1102 (S.D. Ohio 2003) (employer knowledge of previous medical conditions or medical leaves does not create a duty to inquire whether all subsequent illnesses or injuries are related to the known condition or medical leave).  But the email also states Carr requested forms be sent to "another doctor, different specialty," from which one could arguably infer his request was for a medical condition not already covered by his SA Leave claim.  (Doc. No. 38-10).  The email alone does not provide the necessary facts to infer Carr's request was for FMLA leave.  Particularly, when it was raised to Rubin in the context of Carr's existing SA Leave claim for which he had previously sought multiple extensions.  (Doc. No. 38-10) ("just letting you know there may be additional diagnoses requested in *this claim*.") (emphasis added).

The deposition testimony further supports the conclusion that FCA was unaware of Carr's request.  At the time Rubin made her disciplinary recommendation on May 26, 2016, Carr had not

invoked his FMLA rights or notified FCA of any conditions which might qualify him for FMLA leave. Carr testified his leave of absence beginning in June 2016 was pursuant to the SA program and that he was aware of the difference between SA Leave and FMLA leave. (Doc. No. 25 at 47). Carr further testified he did not discuss his intermittent FMLA leave request with anyone in FCA HR or management. (*Id.* at 69). Rubin confirmed she knew only of Carr's SA Leave but not any FMLA leave. (Doc. No. 35 at 18). Brown and Richie also testified they had no knowledge of Carr's FMLA request. (Doc. No. 26 at 16; Doc. No. 34 at 18).

The evidence Carr presents to refute this – the September 6 email – lacks specificity and is insufficient to provide notice to Rubin that Carr was seeking FMLA leave rather than another SA Leave extension. Even if this email were sufficient to put Rubin on notice of Carr's request, the ultimate decisionmakers here were Brown and Richie. (Doc. No. 35 at 18; Doc. No. 26 at 7-8). Both testified they did not have knowledge of Carr's FMLA status and Carr presents no evidence to refute their testimony. It is not enough for Carr to prove "institutional knowledge of his FMLA status[;] [Carr] had to prove that the decisionmakers involved in the determination to [terminate him] had knowledge of his FMLA status." *Slusher v. U.S. Postal Serv.*, 731 F. App'x 478, 480 (6th Cir. 2018).

Because the decisionmakers involved in Carr's termination did not have knowledge of Carr's FMLA status when they acted, Carr cannot establish the second element of his prima facie claim. Accordingly, I find Carr has failed to satisfy his burden of establishing a genuine dispute of material fact and therefore, Count 1 is dismissed.

## B. RETALIATION UNDER OHIO REVISED CODE § 4112.02(I)

Ohio Revised Code § 4112.02(I) makes it unlawful "[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice . . . or because that person has made a charge, testified, assisted, or participated in any

manner in any investigation, proceeding or hearing [regarding such discriminatory actions]." To establish a case of retaliation, Carr must prove: (1) he was engaged in protected activity; (2) FCA was aware Carr had engaged in that activity; (3) FCA took an adverse employment action against him; and (4) there is a causal connection between the protected activity and the adverse action. *Greer-Burger v. Temesi*, 879 N.E. 2d 174, 180 (Ohio 2007).

Because Ohio's own antidiscrimination laws found in Ohio Revised Code Chapter 4112 are modeled after Title VII, "federal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Id.* (quoting *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civ. Rights Comm.*, 421 N.E.2d 128, 131 (Ohio 1981)); *see also Mengelkamp v. Lake Metro. Hous. Auth.*, 549 F. App'x 323, 329-30 (6th Cir. 2013). Title VII retaliation claims require proof of "but-for" causation, and therefore, Carr must show retaliation was the "determinative factor – not just a motivating factor – in the employer's decision to take adverse employment action." *Smith v. Dep't of Pub. Safety*, 997 N.E.2d 597, 614 (Ohio Ct. App. Sept. 26, 2013) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).

FCA first argues Carr's claim for retaliation under state law is preempted by the NLRB because the alleged protected activity occurred while Carr was performing his duties as union steward. (Doc. No. 36-1 at 13-15). Second, FCA argues that even if the claim is not preempted, Carr cannot establish he engaged in protected activity, that anyone involved in his termination knew of this protected activity, or that there is a causal connection. (*Id.* at 15). In response, Carr cites to his actions in March and July 2015 to prove his protected activity, and an email from Plant HR Manager Schaffer to prove FCA was aware of his actions. (Doc. No. 38 at 22-23).

For purposes of this motion only, I will assume Carr's activities in March 2015, *i.e.*, in raising complaints about disability discrimination and hostile work environment against Jackie O'Neal to FCA's HR, was sufficient to qualify as protected activity. Yet, there is no evidence that anyone

14

involved in the decision to terminate Carr was aware he had made these complaints.  On the face of two of the cited documents, it is not apparent to whom these were presented, if anyone. (Doc. Nos. 38-5 & 38-6).  The final document cited by Carr only reflects former Labor Relations Supervisor Perez's knowledge of the O'Neal complaint.  But Perez was not involved in the decision to terminate Carr.  (*See* Doc. No. 32 at 11, 26).  Rubin became an FCA employee in February 2016, almost a year after the alleged complaint was made, and she testified she did not have any knowledge of nor participate in any investigation involving O'Neal.  (Doc. No. 35 at 16-17).  Carr presents no evidence that either Brown or Richie was aware of the O'Neal complaint.  Further, Carr testified his name was not on any of the complaints which he allegedly assisted in raising, and thus, I cannot infer even a general knowledge of his activities to FCA.  (Doc. No. 25 at 59).

Further, Carr cannot establish the causal element of his claim.  He relies on temporal proximity to infer a causal connection between his advancement of complaints in March 2015 and his termination in September 2016.  (Doc. No. 38 at 16).  This temporal proximity, over a year, is far too attenuated to demonstrate but-for causation, particularly considering the intervening incident on May 24, 2016.  *See, e.g., Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (declining to find inference of causal connection where discipline was between 2-5 months after protected activity); *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1267 (6th Cir. 1986) (finding period of four months between filing of claim and adverse action was insufficient to infer retaliation).  Thus, I find Carr has failed to create a genuine dispute of material fact regarding FCA's knowledge of his protected activity and the causal connection between his alleged protected activity and his termination.

Carr also points to an email sent by Schaffer on May 15, 2016, which Carr argues demonstrates that "FCA intended to target [him] for his constant complaints and headbutting with

management." (Doc. No. 38 at 16-17).[7]  The email describes Carr's actions undertaken as a union

steward, including authorizing an employee to leave work without proper permissions and acting as

a steward for an employee not under his purview.  (Doc. No. 33-17).  Neither of these raise issues

regarding "race, color, religion, sex, military status, national origin, disability, age, or ancestry. . . ."

Ohio Rev. Code § 4112.02(A) and § 4112.02(I); *see also Murdock v. Ottawa Hills*, 731 N.E.2d 284, 286

(Ohio Ct. App. Sept. 10, 1999) (allegations of affiliation with union do not give rise to a cause of

action for retaliation under Ohio Rev. Code § 4112.02(I)).  Thus, because this email does not

demonstrate Carr was raising complaints regarding one of the above protected categories, it does

not serve as evidence of his retaliation claim.

Carr has failed to create a genuine issue of material fact as to elements essential to his state

law claim, and thus, I dismiss Count 2.

### C.  DISABILITY DISCRIMINATION CLAIMS

In Counts 3 and 4, Carr alleges FCA discriminated against him on the basis of an actual or

perceived disability in violation of Ohio law.  (Doc. No. 1); *see* Ohio Rev. Code § 4112.01 *et seq.*

Ohio's disability discrimination statute and the ADA employ the same analysis.  *Kleiber v. Honda of*

*Am. Mfg., Inc.,* 485 F.3d 862, 872 (6th Cir. 2007); *City of Columbus Civil Serv. Comm'n v. McGlane*, 697

N.E.2d 204, 206-07 (Ohio 1998) (regulations and cases interpreting the ADA may be used in

interpreting Ohio disability counterpart).

To state a prima facie case of disability discrimination under Ohio law, Carr must show: (1)

he is disabled; (2) that FCA took an adverse employment action against him, at least in part, because

the employee was disabled; and (3) he could safely and substantially perform the essential functions

---

[7] I have reviewed the exhibit cited by counsel and it contains no statements by Schaeffer.  (*See* Doc. Nos. 38-8 & 38-16).  I believe the document to which counsel is referring is found at Doc. No. 33-17 and consider his argument as applying to that document.

of the job, despite his disability. *See Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 n.3 (6th Cir. 2008) (citing *Hood v. Diamond Prods., Inc.,* 658 N.E.2d 738, 739 (Ohio 1996)).

### 1. ACTUAL DISABILITY

Ohio law defines disability as "a physical or mental impairment that substantially limits one or more major life activities, . . . ; a record of physical or mental impairment; or being regarded as having a physical or mental impairment." Ohio Rev. Code § 4112.01(A)(13). Carr alleges his stress, depression, and anxiety substantially impair the major life activity of working. (Doc. No. 38 at 10). To be substantially limited from working, the individual must be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *Tinsley v. Caterpillar Fin. Servs., Corp.*, 766 F. App'x 337, 342 (6th Cir. 2019).[8]

As evidence of his limitation in working, Carr cites to the SA Leave he took from June-September 2016. (Doc. No. 38 at 16). Carr testified he sought this leave of absence due to the stress from his position as union steward over the last two years. (Doc. No. 25 at 51). But aside from the stress leave caused by his union duties, Carr presents no other evidence to demonstrate he is limited in his ability to work "either a class of jobs or a broad range of jobs in various classes" due to his mental health. *Tinsley*, 766 F. App'x at 342.

---

[8] After the amendment of the ADA in 2008, the Code of Federal Regulations no longer specified requirements for concluding a disability substantially limited the major life activity of working. But the EEOC's interpretive guide still maintains the pre-amendment analysis requiring the limitation to be present in a "broad range of jobs in various classes." *Tinsley*, 766 F. App'x at 342. It further states that "[d]emonstrating a substantial limitation in performing the unique aspects of a single specific job is not sufficient to establish that a person is substantially limited in the major life activity of working." *Id.; see also* 29 C.F.R. § 1630 Appendix; *Mancini v. City of Providence*, 909 F.3d 32, 40 & 42 n.6 (1st Cir. 2018) (noting the Amendments applied and that in order to show the plaintiff was substantially limited in performing the major life activity of working, he was required to show it limited his "ability to perform a class of jobs or broad range of jobs"); *Carothers v. Cnty. of Cook*, 808 F.3d 1140, 1147-48 (7th Cir. 2015) (same).

17

It is well-established that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Oszust v. Westrock Servs., Inc.*, No. 2:15-cv-2950, 2017 WL 1037116, at *6 (S.D. Ohio Mar. 17, 2017) (citing *Murphy v. United Parcel Servs., Inc.*, 527 U.S. 516, 523 (1999)); *see also Mahon v. Crowell*, 295 F.3d 585, 591-92 (6th Cir. 2002) ("To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice."). Carr cites to no evidence to establish his mental health conditions substantially limited his ability to perform other work at FCA or elsewhere.

Indeed, the record reflects otherwise. At the conclusion of his SA Leave, Carr underwent an IME for his mental health, and this resulted in him being cleared to return to work without restrictions. (*See* Doc. Nos. 25-15 & 38-29). "Other than the inability to perform the job he lost, [Carr] never mentions any way in which he is limited as to 'working,' let alone how he is restricted from 'either a class of jobs or a broad range of jobs.'" *Nagel v. Husky Lima Refinery,* No. 3:09-CV-828, 2011 WL 1100237, at *6 (N.D. Ohio Mar. 23, 2011). Accordingly, Carr has not established he is disabled due to an impairment that substantially limits his major life activity of working.

### 2. RECORD OF IMPAIRMENT

Carr also argues he can establish disability through his record of impairment. (Doc. No. 38 at 16). A plaintiff has a record of impairment if he "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *Neely v Benchmark Family Servs.,* 640 F. App'x 429, 435 (6th Cir. 2016). "The central [record-of-impairment] inquiry must be whether [Carr] is unable to perform the variety of tasks central to most people's daily lives, not whether [Carr] is unable to perform the tasks associated with [a] particular job." *Laferty v. United Parcel Serv., Inc.,* 186 F. Supp. 3d 702, 710 (W.D. Ky. 2016) (internal quotation omitted). In support of his claim of a record of impairment, Carr cites to the IME report of Dr.

Schmidt, (Doc. No. 38-29), and the Sedgwick documents. (Doc. Nos. 38-27 through 38-31; Doc. Nos. 25-11 through 25-18).

In reviewing the evidence presented, the documentation provided to Sedgwick or contained in Sedgwick's communications, (*id.*), establishes Carr's impairment but does not discuss restrictions on Carr's ability to work or to perform daily activities. At best, these documents present an inference of Carr's limitation in working, but that inference is undermined by other record evidence. For example, Dr. Schmidt's report explicitly tied Carr's limitations to the position of union steward. (Doc. No. 38-29). Carr admitted he would fine returning to assembly line work but the "job as a union steward was just more than what he could handle . . . ." (*Id.* at 1-2). Carr stated his symptoms had already lessened while being off work and out of the steward position; and that "getting away from the union steward's job probably has done more for him than any other single factor . . . ." (*Id.* at 2). Dr. Schmidt cleared Carr to return to work as a production worker without restrictions. (*Id.* at 4).

Like the analysis above for actual disability, Carr has failed to create a genuine dispute of material fact that he had a record of impairment which substantially limited his ability to work. Notwithstanding his diagnoses, he has failed to show how these impairments limit or preclude him from any class of jobs available to him. *See e.g., Laferty,* 186 F.Supp. 3d at 709-10 (plaintiff must demonstrate how the impairment significantly restricts his ability to perform a wide range of other jobs to be disabled); *Porterfield v. Symrise, Inc.,* No. 1:14-cv-2005, 2016 WL 828757, at *4 (N.D. Ohio Mar. 3, 2016) (establishing an impairment is not equivalent to establishing disability for ADA purposes); *Cannon v. Levi Strauss & Co.,* 29 F. App'x 331 (6th Cir. 2002) (impairment must show preclusion from broad class of jobs to qualify as disability). Accordingly, I grant summary judgment as to Count 3.

### 3. "REGARDED AS" DISABLED

In Count Four, Carr alleges FCA discriminated against him based upon a perceived disability. Carr can satisfy his prima facie case for disability discrimination by establishing he was "regarded as" having a disability by FCA. Carr "need only show that [his] employer believed [he] had a 'physical or mental impairment,' as that term is defined in federal regulations." *Babb v. Maryville Anesthesiologists P.C.,* 942 F.3d 308, 319 (6th Cir. 2019). In his brief, Carr asserts FCA had knowledge of his anger issues and stress complaints prior to making the decision to terminate him. (Doc. No. 38 at 11). FCA rebuts this assertion and argues it had no knowledge of impairments at the time of the disciplinary recommendation and thus, could not have "regarded" him as disabled. (Doc. No. 40 at 10-11); *Miller v. Univ. Hosps. Health Sys.,* No. 19-3788, 2020 WL 4783553, at * 4 (6th Cir. Aug. 13, 2020) ("A defendant cannot discriminate 'because of' a disability if it has no knowledge of that disability.").

As evidence FCA was aware of his mental impairments, Carr first cites to the deposition testimony of Rubin, Price, and Perez to establish they were aware of his anger issues. (Doc. No. 32 at 18; Doc. No. 33 at 15; Doc. No. 35 at 15). Yet, the deposition testimony does not, on its own, establish a mental impairment, as none of the deponents characterized Carr's anger as anything other than a performance issue. Carr next cites to his statement at his disciplinary interview in May 2016 with Rubin and Price, where he stated he wanted to seek counseling for stress. (Doc. No. 33-15 at 9). Again, the expression of a symptom – stress – is insufficient to establish FCA regarded him as disabled.

Without more, knowledge of an employee's stress or anger does not automatically equate to a belief the employee is impaired, particularly as neither emotion is exclusive to those who suffer from mental impairments. *See e.g., Neely,* 640 F. App'x at 435–36 ("We note, however, that it is not enough that the employer is simply aware of a plaintiff's symptoms; rather the plaintiff must show

that the employer regarded the individual as 'impaired' within the meaning of the ADA."); *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016) ("A prima facie case is not made out if the decisionmaker is unaware of the specifics of an employee's disabilities or restrictions, even if the decisionmaker has a general knowledge that a disability exists."); *Glover v. Fibercorr Mills, LLC*, No. 5:17-CV-1369, 2018 WL 6831141, at *6 (N.D. Ohio Dec. 28, 2018) ("Further, to the extent that the drug test shows Fibercorr was aware of Glover's prior drug use, pointing to the place in the record where an employer admits knowledge of employee's alleged impairment does not amount to regarding the employee as disabled.").

Carr also argues Rubin was aware of his diagnosis of mental impairments by at least July 27, 2016, and thus regarded him as disabled prior to his termination in September 2016.  (Doc. No. 33-19; Doc. No. 35 at 31, 33).  As stated above, even knowledge of an impairment may not amount to regarding the employee as disabled.  But taking the evidence together and in a light most favorable to Carr, it is conceivable a jury could reasonably find FCA had enough indications of mental impairment to regard Carr as disabled – based off his known anger issues, expressed need for stress counseling, and the confirmed diagnosis of mental conditions – prior to his termination on September 28, 2016.

### 4.  PRETEXT

When a prima facie case has been established, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse action.  *Talley*, 542 F.3d at 1105; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  If the defendant is successful, the burden shifts back to the plaintiff to establish that the reason proffered was merely pretext for unlawful discrimination.  *Talley,* 542 F.3d at 1105.  Pretext can be demonstrated by evidence: (1) that the proffered reasons had no basis in fact; (2) that the proffered reason did not actually motivate the

termination; or (3) that the proffered reason was insufficient to motivate discharge. *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 511 (6th Cir. 2004).

FCA argues Carr's termination was for a legitimate, non-discriminatory reason – violating FCA's Standards of Conduct. (Doc. No. 36-1 at 15-17). FCA established through witness testimony and Carr's own admissions that he threw his phone towards Isaac during a disagreement. (Doc. No. 25 at 42; Doc. No. 35 at 23; Doc. No. 33-15 at 4-8, 14). During the disciplinary investigation, Isaac described Carr's behavior as "violent" and that it made her "very uncomfortable because it had become a hostile environment." (Doc. No. 33-15 at 4-5). Further, comments from other witnesses described the context of Carr's actions as "clearly emotional," "like an unruly child," "upset and argumentative," "disrespectful," and "unprofessional." (Doc. No. 33-15 at 4-7). Taken together, these present a legitimate basis for discipline.

### FCA's Proffered Reason for Termination is Insufficient

But Carr asserts his conduct was not sufficient to warrant termination and in support, he argues Richie testified Carr's actions "didn't rise to the level of sense of urgency" to terminate him. (Doc. No. 38 at 19). To provide context for Richie's testimony, a relevant excerpt follows:

Q. You previously testified that FCA had terminated individuals on leave, right?

A. That is quite possible, yes.

Q. And so why didn't that happen here?

A. This was not a circumstance under which we would have done that.

Q. Why is that?

A. Just didn't rise to the level of sense of urgency to do it, and given the fact that, you know, Travis was a union official, we just didn't feel the need to take that kind of immediate action here.

Q. What do you mean, it didn't rise to the sense of urgency?

A. So, again, circumstances under which we would terminate someone who was on a leave tend to be the circumstances that have pretty severe consequences or issues. An example, someone that goes out on leave that we subsequently

find out was involved in a workplace violence issue where there was
someone who was in a physical altercation, incidents that involved weapons,
guns, knives.  That kind of situation would rise to a level where we would
feel the need to send that person a termination letter in the mail based on our
investigation.

(Doc. No. 34 at 13-14).

While elsewhere in his deposition Richie testified Carr's conduct was sufficient to warrant termination, the above cited testimony certainly raises the question of whether that was the case. Arguably, Carr participated in exactly the type of conduct which Richie testified would warrant immediate termination – he committed workplace violence against Isaac by throwing his phone at her.  The only apparent difference being that Carr's phone did not actually strike Isaac.  Also, the FCA Standards of Conduct, cited in Carr's termination notice, seem to apply directly to workplace violence.  (*See* Doc. No. 25-19) ("SOC #14: 'Threatening, intimidating, coercing, harassing, retaliating or abusive words and/or actions. . .'" and "SOC #15: 'Fighting. . .or other disorderly, disruptive or unruly conduct.'").

But Carr was not immediately terminated, allegedly, because he was out on leave; yet, if that were the sole reason for the delay in Carr's termination why was he not terminated upon his return to work on September 12, 2016?  A reasonable juror could find FCA's position that Carr's conduct warranted termination, just not immediately and not upon his first day back from leave, suspicious. Particularly, where FCA has not provided any explanation as to why there was a two-week plus delay between Carr's return and his termination.  Taking the evidence in a light most favorable to Carr, I conclude he has raised a genuine dispute of material fact as to pretext, and thus, I deny summary judgment to FCA on Count 4.

**D**.  **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

Carr concedes that as a member of a collective bargaining unit, he is not permitted to pursue a claim for wrongful termination in violation of public policy.  (Doc. No. 38 at 26); *see, e.g., Haynes v. Zoological Soc'y of Cincinnati*, 652 N.E.2d 948, 951 (Ohio 1995); *Staunch v. Continental Airlines, Inc.,* 511 F.3d 625, 632-33 (6th Cir. 2008).  Accordingly, I grant summary judgment to FCA on Count 5.

## V.  CONCLUSION

In sum, I find there are no genuine disputes of material fact to preclude summary judgment for FCA at Counts 1, 2, 3, and 5, and FCA is entitled to relief as a matter of law.  But, I also conclude, when viewing the evidence in a light most favorable to Carr, he has sufficiently supported his prima facie claim for "regarded as" disability discrimination and raised a genuine dispute of material fact as to pretext in relation to Count 4.   Therefore, I grant FCA's Motion for Summary Judgment as to Counts 1, 2, 3, and 5; and I deny FCA's motion as to Count 4.  (Doc. No. 36).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge