UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Travis Carr,  Case No. 3:18-cv-2206

    Plaintiff,

v.  MEMORANDUM OPINION
AND ORDER

FCA US, LLC,

    Defendant.

## I.     INTRODUCTION

On September 25, 2018, Plaintiff Travis Carr filed a complaint against Defendant FCA US, LLC alleging FMLA retaliation, wrongful or retaliatory termination, and disability discrimination under Ohio law. (Doc. No. 1). In March 2022, I granted FCA partial summary judgment on four counts of the complaint but denied summary judgment as to Carr's disability discrimination claim. (Doc. No. 41). Both parties moved for reconsideration of my ruling.

Carr sought reconsideration of my ruling that he could not establish a prima facie case of FMLA retaliation. (Doc. No. 44). FCA challenged my determination that Carr established a prima facie case of disability discrimination and that a genuine issue of material fact existed on the issue of pretext. (Doc. No. 45). Each party opposed the other's motion. (Doc. Nos. 46 & 47). For the following reasons, I deny Carr's motion for reconsideration and I grant FCA's motion for reconsideration.

## II. BACKGROUND

For purposes of this opinion, I will summarize only the facts relevant to the parties' respective motions for reconsideration. A detailed account of the facts leading to Carr's complaint and termination are found in my summary judgment opinion. (*See* Doc. No. 41 at 1-9).

On May 24, 2016, Carr, an elected union steward, was auditing a Union committee election count. (Doc. No. 25 at 34, 154). During the count, Carr threw his phone at another employee. Following an investigation, Connie Rubin, a labor relations supervisor, recommended he be terminated. (Doc. No. 41 at 3-5). Carr's termination was approved locally at the plant on May 27, 2016, but it also required the approval of FCA's corporate Labor Relations to finalize the termination. (*Id.* at 5). Director of Employee Relations Roy Richie testified he received the disciplinary recommendation sometime prior to June 2, 2016, from his subordinate Jo'Lena Brown. (*Id.*). Nevertheless, no action was taken on the disciplinary recommendation at that time because on June 2, 2016, Carr applied for a leave of absence. (*Id.*).

Carr applied for a leave of absence under the Sickness and Accident program ("SA Leave").[1] (Doc. No. 25 at 185; Doc. No. 25-11). On June 3, 2016, Sedgwick[2] sent Carr a letter confirming his application for disability benefits under SA Leave and assigning him SA Leave Claim #30165942021. (Doc. No. 25-11). Carr's SA Leave was initially approved for stress, anxiety, and depression until June 30, 2016. (Doc. No. 41 at 6-7). Carr also certified a left-hand injury under the same SA Leave claim number that extended his leave of absence until July 31, 2016. (*Id.*). Carr

---

[1] SA Leave is a contractual benefit for Union members, independent of FMLA leave, that provides up to 52 weeks of paid leave to eligible employees. (Doc. No. 25 at 186).

[2] Sedgwick is an independent third-party administrator that manages employee leave for FCA. It is standard procedure for employees to only notify Sedgwick of their leave requests and the reasons for those requests. Similarly, the medical documentation is submitted only to Sedgwick. (Doc. No. 25 at 183-84).

2

extended his SA Leave twice more under the same SA Leave claim number until September 11, 2016, to accommodate a surgery and his mental health conditions. (*Id.* at 7-8).

No later than July 27, 2016, Rubin learned of the reasons for Carr's SA Leave, including his mental health diagnoses. (Doc. No. 35-11). Subsequently, Carr was ordered to complete an independent medical examination ("IME") for those conditions before he would be permitted to return to work. (Doc. No. 41 at 7-8). The IME concluded Carr's stress and anxiety were tied specifically to his position as union steward, but he could otherwise return to work without restrictions for his mental health conditions. (*Id.*).

On September 6, 2016, Sedgwick emailed Rubin regarding Carr. The following is the content of the communication:

> Mr. Carr's SA claim was approved for both a physical and mental health condition. Mr. Carr had a DEP (IME) on Friday Sept 2 and was found able to return to work with no restrictions as a result of the MH condition. The medical cert for the physical condition expired 8/31/16. Sedgwick will call Mr. Carr today and tell him to report to plant medical for reinstatement. However, Mr. Carr asked Sedgwick to fax disability forms to ANOTHER doctor, different specialty. We have not received any medical from that doctor yet, just letting you know there may be additional diagnoses requested in this claim.

(Doc. No. 38-10) (emphasis in original).

On September 7, 2016, Sedgwick sent a communication to Carr confirming he had requested intermittent FMLA leave on September 6, 2016, but withholding a determination on his eligibility. (Doc. No. 25-17). This correspondence assigned a new claim number (#3016646743600011FN) to Carr's request. When Carr returned to work on September 12, 2016, his request for FMLA leave was still pending and would ultimately not be approved by Sedgwick until after his termination. (Doc. No. 25-18).

Sometime after September 6, 2016, when Rubin learned Carr was cleared to return to work, she reached out again to Brown regarding Carr's termination. (Doc. No. 35 at 127-28; *see also* Doc. Nos. 28 & 33-18). Brown emailed Rubin on September 27, 2016, informing her that she could

3

proceed with Carr's termination. (Doc. No. 29 at 3). Brown testified she was merely the messenger of Carr's termination, and the final decision to terminate was made by Richie. (Doc. No. 26 at 39-40). Richie confirmed he did not challenge the recommendation that Carr be terminated. (Doc. No. 34 at 59). FCA informed Carr of his termination on September 28, 2016, for violating FCA's Standards of Conduct 14 and 15[3] on May 24, 2016. (Doc. No. 25-19).

### III. STANDARD

"District courts possess the authority and discretion to reconsider and modify interlocutory judgments any time before final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund,* 89 F. Appx. 949, 952 (6th Cir. 2004). Yet in general, "[m]otions for reconsideration are disfavored[.]" *Davie v. Mitchell*, 291 F. Supp. 2d 573, 634 (N.D. Ohio 2003).

"Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez*, 89 F. App'x at 959 (citation omitted). As the Sixth Circuit has noted:

> It is well-settled that parties cannot use a motion for reconsideration to raise new legal arguments that could have been raised before a judgment was issued. Additionally, reconsideration motions cannot be used as an opportunity to re-argue a case. Furthermore, a party may not introduce evidence for the first time in a motion for reconsideration where that evidence could have been presented earlier.

*Bank of Ann Arbor v. Everest Nat. Ins. Co.*, 563 F. App'x 473, 476 (6th Cir. 2014) (internal quotation marks and citations omitted).

---

[3] Standard of Conduct No. 14 prohibits "[t]hreatening, intimidating, coercing, harassing, retaliating, or abusive words and/or actions, conveyed physically, orally, in writing or otherwise, that would cause reasonable people to take actions against their will, feel unsafe, uncomfortable, or in fear of danger or violence, including directing aggressive use of obscene or profane language or gestures toward or in the presence of another." (*Id.*). Standard of Conduct No. 15 prohibits "[f]ighting, 'horseplay' or other disorderly, disruptive or unruly conduct." (*Id.*).

## IV. ANALYSIS

### A. Carr's Motion for Reconsideration

Carr's motion for reconsideration sought relief from my conclusion that Carr could not establish a prima facie case of FMLA retaliation because FCA was not on notice of any FMLA qualifying activity at the time of Carr's termination. (Doc. No. 44). For the first time in his motion for reconsideration, Carr argues that he "actually utilized FMLA leave[,]" and not SA Leave, when he was off work from June – September 2016, and thus, all relevant decisionmakers, Rubin, Brown, and Richie, were aware of his protected activity prior to his termination. (*Id.*).

Not only is this position contrary to that expressed in Carr's opposition to FCA's motion for summary judgment, but it is also wholly unsupported by the evidence. For example, in his brief in opposition to FCA's motion for summary judgment, Carr wrote: "Carr applied to utilize intermittent FMLA leave on September 6, 2016." (Doc. No. 38 at 23). In support of his opposition, Carr submitted the medical certification supporting his request for intermittent FMLA leave; the date this document was signed: September 23, 2016. (Doc. No. 38-30). Carr himself testified that the leave of absence from June – September 2016 was taken pursuant to the SA program and that he was aware of the difference between SA Leave and FMLA leave. (Doc. No. 25 at 185-87). These statements, and the documentation Carr provided, preclude his retroactive attempt to characterize his SA Leave as FMLA leave.

The Sedgwick documents support the position that SA Leave and FMLA leave are distinct; this is evidenced by the separate claim numbers assigned to Carr's requests. Carr's initial leave of absence was assigned claim number #30165942021, and this claim number applied to each of Carr's four requests for an extension of his leave of absence. (*See* Doc. Nos. 25-11, 25-12, 25-13 & 25-16). When Carr applied for intermittent FMLA leave, Sedgwick assigned him a new claim number, #301664674360001IFN. (Doc. No. 25-17).

Further, Rubin, Brown, and Richie all testified they had no knowledge of Carr's FMLA request, (Doc. No. 35 at 71; Doc. No. 26 at 62; Doc. No. 34 at 70); and Carr confirmed he did not discuss his FMLA request with anyone in FCA HR or management. (Doc. No. 25 at 276).

Carr's motion for reconsideration does not identify a clear error that disturbs my conclusion on summary judgment that he failed to present a genuine issue of material fact as to FCA's knowledge of his alleged FMLA protected activity. This motion presents nothing more than an attempt to re-argue the case based upon a different characterization of the facts, but that characterization is unsupported by the record. *See Bank of Ann Arbor,* 563 F. App'x at 476 (holding reconsideration motions cannot be used to re-argue the case). Therefore, I deny Carr's motion for reconsideration.

### B. FCA's Motion for Reconsideration

FCA's motion for reconsideration properly identifies a deficiency in the summary judgment opinion regarding Carr's disability discrimination claim (Count 4). (Doc. No. 45). I failed to analyze the second prima facie element – whether FCA took an adverse action against Carr, at least in part, because of his disability – before moving on to the issue of pretext. (*See* Doc. No. 41 at 21).

On summary judgment I concluded that Rubin's knowledge of Carr's mental health diagnoses in July 2016, coupled with her previous knowledge of his anger and stress issues, was sufficient to create a genuine dispute of material fact as to whether FCA regarded him as disabled prior to his termination in September 2016. (*Id.*). FCA argues the decision to terminate Carr was made in May 2016 and thus, Rubin's later acquired knowledge of Carr's mental health diagnoses in July 2016, is irrelevant and cannot have factored into her disciplinary recommendation. (Doc. No. 45 at 3). It further argues there is no evidence Richie was ever aware of Carr's conditions. (*Id.* at 3-4).

6

It is true that Rubin completed her investigation and made her recommendation to terminate Carr on May 26, 2016, prior to learning of his mental health diagnoses. (Doc. No. 33-15 at 2; Doc. No. 35 at 124). But Rubin's recommendation was not the final word on Carr's termination; it required the approval of FCA's corporate Labor Relations department as well. (Doc. No. 26 at 25-29; Doc. No. 34 at 28-29). Richie testified he reviewed the disciplinary report and recommendation prior to June 2, 2016, when Carr took a leave of absence. (Doc. No. 34 at 46, 51). But Richie's review of Rubin's recommendation is not the same as his approval to terminate Carr.

In early September 2016, neither Rubin nor Brown was aware of Richie's decision regarding Carr's termination. Rubin testified she reached out to Brown after learning Carr was approved to return to work in early September 2016, because corporate "still needed to make a decision." (Doc. No. 35 at 128-129; *see* Doc. No. 33-18). Brown testified similarly. (Doc. No. 26 at 70-71, Q: [W]hen you are sending this email to R[ichie], are you still trying to decide whether his employment will be terminated? A: I'm trying to seek from R[ichie] what the decision, the final outcome was. Q: So as of September 20th [ ] there wasn't a decision to terminate his employment at that point? A: According to my e-mail, no.). Brown sent an email to Rubin on September 27, 2016, informing her that Carr could be terminated. (Doc. No. 26 at 39-40; *see* Doc. No. 29 at 3, "Travis Carr – Proceed with discharge.").

While FCA asserts the decision to terminate Carr was made in May 2016, viewing the evidence in a light most favorable to Carr, there remains an issue of fact as to when Richie made his decision. Regardless, this issue is not material because there is no evidence that Richie, either in May 2016 or September 2016, was ever aware of Carr's mental health diagnoses or the other indicia of Carr's mental health issues, such as anger and stress. Thus, the record does not establish that consideration of an alleged disability could have played a part in Richie's decision to terminate Carr.

7

In his opposition to FCA's motion to reconsider, Carr advances for the first time the theory of cat's paw liability to impute Rubin's knowledge of Carr's mental health conditions to Richie. (Doc. No. 46 at 2-5). "The primary rationale of the cat's paw theory of liability is that, because 'a company's organizational chart does not always accurately reflect its decisionmaking process,' an employee of lower rank may have significant influence over the decisionmaker[,]" and thus, the ultimate decisionmaker may be "at risk of being 'the conduit of the lower-level decisionmaker's prejudice.'" *Marshall v. The Rawlings Co., LLC*, 854 F.3d 368, 378 (6th Cir. 2017) (internal citations omitted).

Carr forfeited this argument by not raising it earlier in his defense to summary judgment. *See Wallace v. Wayne Cnty.*, 602 F. App'x 223, 230 (6th Cir. 2015). FCA's motion for summary judgment, including the testimony of FCA's witnesses, established that Carr's termination required corporate approval, as opposed to just Rubin's approval. (Doc. No. 36-1 at 11 (*citing* Doc. No. 34 at 28-30 and Doc. No. 32 at 48, 54)); (*see also* Doc. No. 26 at 25-29). Thus, Richie's knowledge of Carr's conditions, and whether his decision to terminate was motivated by those conditions, was relevant to Carr's defense to summary judgment. It was Carr's position in opposition to summary judgment that Rubin had knowledge of his alleged disability both before and after making her disciplinary recommendation in May 2016. (Doc. No. 38 at 17). As such, Carr could have advanced the cat's paw theory that Rubin's knowledge of Carr's alleged disability improperly influenced her decision to recommend Carr's termination to Richie, either in May 2016 or sometime in the intervening months. But he did not.

A motion to reconsider "may not . . . serve as a vehicle to identify facts or raise legal arguments which could have been, but were not, raised or adduced during the pendency of the motion for which reconsideration is sought." *Hazard Coal Corp. v. Am. Res. Corp.,* No. 6:20-CV-010, 2022 WL 18638743, at *3 (E.D. Ky. Sept. 9, 2022). Because Carr failed to raise this argument

8

earlier, I cannot now consider whether cat's paw liability would have operated to impute Rubin's knowledge and alleged bias to Richie and, ultimately, to create a genuine issue of fact to preclude summary judgment. *See Marshall*, 854 F.3d at 383 ("Because [Rubin] w[as] not the final decisionmaker[ ], [Carr's] claim survives summary judgment only if there is at least a genuine dispute of material fact as to whether [Rubin] influenced [Richie to terminate Carr].").

FCA demonstrated on summary judgment and in its motion for reconsideration that there is an absence of evidence demonstrating that Richie knew of or was motivated by Carr's alleged disability when he terminated him, as would be required to satisfy the second prima facie element of Carr's disability discrimination claim. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir. 1996) ("[T]he defendant cannot discriminate 'because of' a disability if it has no knowledge of the disability."); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden of the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."). Since FCA has properly identified an error in my analysis on summary judgment, I grant FCA's motion for reconsideration.

## V. CONCLUSION

For the foregoing reasons, I deny Carr's motion for reconsideration, (Doc. No. 44), and I grant FCA's motion for reconsideration. (Doc. No. 45). Accordingly, I reconsider my prior ruling on summary judgment with regard to Count 4, disability discrimination, (Doc. No. 41), and grant FCA's motion for summary judgment as to that claim. (Doc. No. 36). As Carr has no viable claims remaining, the case is dismissed.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge

9